# In the United States Court of Federal Claims

Case No. 92-265C
FOR PUBLICATION
Filed January 25, 2008

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **REPUBLIC SAVINGS BANK, FSB, et al.,** *  *  * | |
| *Plaintiffs*, * * | Summary Judgment; Standing; *Winstar* line of cases; FIRREA; 12(b)(6); Breach of Contract; |
| v. * * | Restitution; Pre-judgment Interest. |
| **THE UNITED STATES**, * * | |
| *Defendant*. * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*David J. Hensler*, Hogan & Hartson LLP, Washington, D.C., for Plaintiffs.

*Elizabeth A. Holt*, with whom were *David M. Cohen,* Director*,* and *Jeanne E. Davidson,* Deputy Director,, Commercial Litigation Branch, Civil Division, Department of Justice*,* for Defendant*. Ashley N. Bailey*, Trial Attorney, of counsel.

## OPINION

SMITH, Senior Judge:

### I. Introduction

This case arises out of the *Winstar* line of cases, the background of which is well-described in *United States v. Winstar Corp.*, 518 U.S. 839 (1996)(*Winstar III*); *see also Winstar Corp. v. United States*, 64 F.3d 1531 (Fed. Cir. 1995)(en banc)(*Winstar II*); *Winstar Corp. v. United States*, 21 Cl. Ct. 112 (1990); *Statesman Savings Holding Corp. v. United States*, 26 Cl. Ct. 904 (1992). Before the Court are Plaintiffs' Motion for Summary Judgment, Defendant's Cross-Motion for Summary Judgment, and Defendant's Motion to Dismiss Plaintiff Meadows for lack of standing.

The Court has heard arguments regarding the above mentioned motions. After careful consideration, and for the reasons set forth in this opinion, the Court hereby **GRANTS** Plaintiffs' Motion for Summary Judgment. Defendant's Motion for Summary Judgment is, therefore,

**DENIED**.  Further, the Court **GRANTS** Defendant's Motion to Dismiss Plaintiff Meadows from the litigation.

## II.  Facts

Like many other thrifts of its time, Citizens Federal Savings and Loan Association of Matteson, Illinois (Citizens) and Fireside Federal Savings and Loan Association of Cicero, Illinois (Fireside) encountered significant financial difficulties during the savings and loan crisis of the early 1980s.  During the thrift crisis, the Federal Savings and Loan Insurance Corporation (FSLIC) and the Federal Home Loan Bank Board (FHLBB) sought to ameliorate the situation by encouraging healthy thrifts to merge with the failing ones.  *See Winstar II*, 64 F.3d at 1535.  In this case, however, instead of a healthy thrift acquiring a failing one, a brand new institution, Republic Savings Bank (Republic) was formed to acquire the two failing thrifts.

### A. Background of Citizens

Citizens had a history of operating losses.  In December 1981, the FHLBB recommended that the Citizens' directorate consider a merger resolution, as Citizens was facing insolvency.  Although the directorate did not adopt a merger resolution, FHLBB-Chicago solicited bids for the acquisition of Citizens in November 1982.  However, Citizens was able to show book solvency, and so in January 1983, the bidders were informed that Citizens was no longer available.

In 1983, Citizens' financial situation worsened; for the six-month period ended September 30, 1983, Citizens incurred a net loss of $786,000.  By 1984, Citizens faced insolvency again, and Government regulators estimated that the present-value cost of liquidating Citizens would be $29.7 million. The FHLBB again recommended a merger resolution. On November 27, 1984, the FHLBB notified Citizens that the bid process would begin without the merger resolution. During the 1984-1985 bid process, nine groups were sent bid packages. The FHLBB received three formal bids. The first was a bid from McKinley Financial Group (McKinley), comprised of Douglas Crocker and Robert Bobb, which will be discussed below. The second was projected to cost more than the $29.7 million estimated present value cost of liquidation, and the third bid from Land of Lincoln Savings and Loan was projected to cost $26.7 million.

### B. Background of Fireside

The FHLBB showed "supervisory concern" over Fireside beginning in 1981.  *See* Federal Home Loan Bank of Chicago Memorandum from Leo B. Blaber to FHLBB (S-Memo).  For the six months ending June 30, 1981, Fireside lost $109,000.  The December 1981 report showed a loss of $378,000.  For the first time, in 1981 Fireside fell below its net worth requirements.  The financial difficulties continued throughout 1982 and 1983.

In late 1984, the Government advised Fireside to start looking for a voluntary merger partner. Fireside pursued merger negotiations with Mid-America Federal and Northwestern Savings of Chicago. These negotiations fell through. On November 28, 1984, Fireside notified the FHLBB

that a preliminary agreement had been reached between Fireside and the McKinley Financial Group. In February 1985, Crocker and Bobb submitted a proposal to assume control of Fireside through a voluntary supervisory stock conversion. As of June 30, 1985, Fireside had a reported net worth of $118,000.

### C. The Creation of Republic Savings Bank

Crocker and Bobb submitted a proposal to the FHLBB-Chicago in May 1985, offering to acquire Citizens and Fireside through Republic Holding Company (RHC).[1] To effectuate the transactions, Crocker and Bobb formed MCB Financial Group (MCB), owned equally by Meadows Resources, Inc, and a Voting Trust controlled by Crocker and Bobb. The proposal stated that RHC would be capitalized in the amount of $17 million, consisting of a $5 million equity interest in a New Mexico general partnership, Bellamah Community Development (BCD), and a $12 million earnings preference on the future earnings of BCD. The two thrifts would be merged into a new institution, Republic Savings Bank, F.S.B. Crocker and Bobb requested in their bid that the FSLIC provide $3 million in cash assistance to Citizens and did not request any cash assistance for Fireside.

On August 30, 1985, Plaintiffs, through the newly formed Republic Savings acquired Citizens and Fireside by merger as a supervisory transaction. The transaction was formally approved by the FHLBB in Resolution No. 85-773. The specific terms of the transaction were set forth in a number of documents, including the Assistance Agreement and the Net Worth Stipulation, both dated August 30, 1985. The Assistance Agreement was entered into between Republic Savings Bank, RHC, MCB, and the FSLIC. Under this agreement, the Government agreed to contribute $3 million towards Republic Savings Bank, while the other three signatories promised to maintain Republic's net worth "at the greater of (1) 5 percent of [Republic's] total liabilities, reduced by 'qualifying balances' as permitted by §563.13(b)(4) of the Insurance Regulations, or (2) the amount required by §563.13(b) of the Insurance Regulations or any successor regulations as in effect from time to time." *See* Assistance Agreement §12. Plaintiffs' capital contribution requirements were set forth in the Net Worth Stipulation and FHLBB Resolution No. 85-773. Republic requested that the $3 million Government contribution be accounted for as net worth rather than as an adjustment to goodwill. S-Memo at 17.

The FHLBB listed the forbearances granted in a letter dated August 30, 1985 to Robert Fahey, President of Republic. (Forbearance Letter). The Forbearance Letter provided, among other things, that "the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by Republic Savings over a period not to

---

[1] Plaintiffs Meadows Resources, Inc (Meadows), MCB Financial Group, Inc. (MCB), and Republic Holding Company (RHC) are subsidiaries of the Public Service Corporation of New Mexico (PNM), an electric utility company. The assets and liabilities of Plaintiff Republic Savings Bank ("Republic") were sold in 1992 to Regency Savings Bank (Regency), a subsidiary of First Bank of Oak Park (FBOP). Republic still exists in the form of a receivership administered by the Federal Deposit Insurance Corporation (FDIC).

exceed 35 years by the straight line method" and that the Government's cash contribution be considered as an addition to its net worth.

### D. The Impact of FIRREA

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA). 12 U.S.C. §1464. The statute obligated the newly formed Office of Thrift Supervision (OTS) to "prescribe and maintain uniformly applicable capital standards for savings associations" in accord with new statutory requirements. 12 U.S.C. §1464(t)(1)(A). OTS promptly implemented new capital standards. *See Winstar III*, 518 U.S. at 857.

Prior to the enactment of FIRREA, Republic had met all of its capital requirements. Republic fell out of compliance following the promulgation of the new rules. Republic missed the risk-based capital compliance by more than $4.737 million but exceeded its tangible and core capital requirements by $2.248 million. Within six months, Republic had cut the shortfall to $643,000. After the Government further tightened risk-based capital standards in December 1990, Republic's shortfall in that area was $2.105 million. Republic's risk-based capital deficit was $2.5 million by the end of 1990, but the company managed to reduce it to $686,000 by June 1991. Still, the company could not bring itself back into compliance.

On June 5, 1992, the Resolution Trust Corporation (RTC) seized Republic and placed it in a conservatorship.[2] On November 6, 1992, Regency Savings Bank (Regency), a subsidiary of First Bank of Oak Park, purchased all of Republic's assets and liabilities from the RTC in a whole bank, no assistance transaction, for $926,000.

### III. Procedural History

Plaintiffs filed a complaint against the United States for breach of contract (Count III) and four other theories of relief: taking without compensation or due process in violation of the Fifth Amendment (Counts 1 & II), rescission (Count IV), and promissory estoppel (Count V). The Government filed an Answer and Counterclaim against Plaintiffs. Plaintiffs then filed an answer to Defendant's counterclaim. Defendant filed a Motion to Dismiss Courts I, II, IV, and V of Plaintiffs' Amended Complaint, and to dismiss Meadows as a Plaintiff. Both parties filed cross-motions for summary judgment. The Court directed the parties to submit one consolidated brief each for all liability and damages motions pending, and heard oral argument on the cross-motions. With leave of the Court, the Government filed a supplemental brief regarding restitution and Plaintiffs filed a supplemental brief regarding reliance damages for the costs of receivership. The

---

[2] When RTC ceased to exist on December 31, 1995, the Federal Deposit Insurance Corporation ("FDIC") succeeded RTC as receiver for Republic.

4

case is now before the Court on cross-motions for summary judgment and on the motion to dismiss Meadows as a Plaintiff.

## IV.  Motion to Dismiss Plaintiff Meadows

### A.  Legal Standard

A motion to dismiss for failure to state a claim under RCFC 12(b)(6) tests the sufficiency of the complaint.  Dismissal is only appropriate when the accepted pleading standard set forth in RCFC 8(a)(2) is not met: "once a claim for relief has been stated adequately, it may be supported by showing any set of facts consistent with the allegation in the complaint."  *Bell Atl. Corp. v. Twombly*, 550 U.S. - -, 127 S. Ct. 1955, 1965 (2007).  Moreover, "once a claim for relief has been stated, a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint."  *Id.* at 1969 (citation and internal quotation marks omitted).

### B.  Meadows Lacks Standing

Defendant argues that Plaintiff Meadows lacks standing to bring suit because it was not in privity with the Government. D. Mot. Dismiss at 33.  The Federal Circuit has held in a *Winstar*-related case that where a shareholder plaintiff was not a signatory to the agreement with the regulator, that plaintiff did not have standing to sue the Government.  *Castle v. United States*, 301 F.3d 1328 (Fed. Cir. 2002) *reh'g and reh'g* en banc *denied*, 64 Fed. Appx. 227 (Fed. Cir. 2003) and *cert. denied*, 539 U.S. 925 (2003).  In *Castle*, those plaintiff shareholders who had not signed the relevant agreement and who did not participate in the negotiations for the agreement did not have standing to sue as third-party beneficiaries.

The preamble of the Assistance Agreement identifies Republic, MCB, RHC, and FSLIC as the parties.  Meadows did not sign the agreement and the "sole benefit" provisions exclude parties other than those mentioned above. Meadows was also not a signatory to the Net Worth Maintenance Stipulation and was not required to maintain Republic's capital.  As Meadows was not a signatory and was not involved in the negotiations, the Court finds that Meadows was not in privity with the Government.  Plaintiff Meadows, therefore, lacks standing to bring suit against the United States for this transaction.  The Court hereby **GRANTS** Defendant's motion to Dismiss Meadows as a Plaintiff under RCFC 12(b)(6) for failure to state a claim upon which relief may be granted.

## V.  Motion for Summary Judgment

### A.  Legal Standard

Summary judgment is appropriate where there are no genuine disputes over material facts and the moving party is entitled to prevail as a matter of law. RCFC 56(c).  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Material facts are those "facts that might affect the outcome"

of the litigation. *Id.* at 248. A genuine dispute concerning a material fact exists when the evidence presented would permit "a reasonable jury [to] return a verdict for the non-moving party." *Id.* Thus, in order to prevail upon a motion for summary judgment, a party must demonstrate that no disputed facts exist which would change the outcome of the litigation. Any doubt over a factual issue must be resolved in favor of the non-moving party, to whom the benefit of presumptions and inferences runs. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *United States v. Diebold Inc.*, 369 U.S. 654, 655, (1962)). The existence of a contract is a mixed inquiry of law and fact. *La Van v. United States*, 382 F.3d 1340 (Fed. Cir. 1998).

### B. The Contract

When dealing with *Winstar* cases, the Court applies "ordinary principles of contract" to determine whether the Government entered into a contract with the private party. *Winstar III*, 518 U.S. at 871. To prove the existence of a contract with the United States, four elements must be satisfied: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003). A case-by-case, factual inquiry is necessary to determine whether a plaintiff in a *Winstar*-related case has met its burden of proving the material elements of a contract for a specified regulatory treatment of goodwill. *See Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001).

The crucial question in this case, as in all *Winstar* cases, is whether the FHLBB entered into a contract with Republic or, on the other hand, if it was merely exercising its regulatory authority. In this case, Republic contends the Government expressly agreed to allow Plaintiffs to record supervisory goodwill as a capital asset for regulatory capital purposes to be amortized over 35 years, and to treat the FSLIC's $3 million cash contribution as a direct credit to Republic's net worth for regulatory accounting purposes. The Government argues that there was no intent to contract for the accounting forbearance concerning goodwill amortization and that this grant was a matter of regulatory policy rather than evidence of contractual intent. In addition, the Government asserts that Plaintiffs expressly bore the risk of any subsequent regulatory change, and that the FHLBB had no authority to enter into contracts with Plaintiffs other than Republic guaranteeing against the risk of loss. The Government concedes that the FHLBB had the authority to enter into such a contract with Republic.

### 1. Mutuality of Intent to Contract

Plaintiffs argue that the Assistance Agreement, the Forbearance letter, and Resolution 85-773, taken together, form the contract with the United States. It is clear for a contract to exist, both parties must have the voluntary, mutual intent to contract. *Anderson*, 344 F.3d at 1353 (citing Restatement (Second) of Contracts § 18 (1981)) ("Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance."). A Plaintiff must show that one party to the contract extended an offer, and that the other party accepted that offer.

*Id.* A Plaintiff may point to several documents to prove mutuality of intent. *Cal. Fed. Bank, FSB v. United States*, 39 Fed. Cl. 753, 773 (1997), *aff'd*, 245 F.3d 1342 (Fed. Cir. 2001) ("Mutuality of intent, even in the context of written contracts, may be established by several contractual instruments as opposed to one superseding document.").

The Government argues that there was no mutuality of intent to contract with respect to the specific forbearance permitting a 35-year amortization period for regulatory reporting purposes, as Plaintiffs did not specifically request this forbearance and thus the grant was "merely a matter of regulatory policy." P. Opp'n at 19. Plaintiffs counter that the FHLBB resolution itself discredits this argument. *See* FHLBB Resolution No. 85-773. In fact, the Resolution states that "the Bank Board has considered certain regulatory forbearances requested by the Applicants and contained in a proposed letter (a copy of which is in the Minute Exhibit File)." FHLBB Resolution No. 85-773 at 24. At oral argument, Plaintiffs stated that the proposed letter mentioned became the Forbearance Letter dated August 30, 1985. In fact, the final Forbearance Letter, dated August 30, also bears the date "8/14/85," when the resolution was promulgated, with the word "draft" beneath it in the top right corner. That letter, according to Plaintiffs, was the same in draft and final form. The final version contains the forbearances granted to Republic, including allowing Republic to amortize any intangible assets according to the purchase method over a period not to exceed 35 years. *See* Forbearance Letter at 2. Again, according to the FHLBB Resolution, Plaintiffs requested "certain regulatory forbearances . . . contained in a proposed letter." FHLBB Resolution No. 85-773 at 24. This, combined with evidence in the record that Republic would not have acquired Citizens and Fireside but for the goodwill accounting forbearance, suggests that Republic specifically requested the particular forbearance.[3] Therefore, the Court finds that the offer and acceptance were clearly memorialized in the Forbearance Letter.

In addition, as Plaintiffs note, Defendant's argument must fail in light of the Supreme Court's decision in *Winstar III*. 518 U.S. at 839. In that case, the Supreme Court examined the "Supervisory Action Agreement" approving the merger of Glendale, and found that the integration clause in that agreement characterized the resolutions and letters as part of the "agreements and understandings" between the parties. *Id*. This led the Court to construe the agreements as a contract. Further, if there was any ambiguity left by the integration clause, the Court found that the document should be construed in the context of "the realities of the transaction." *Id*. (citing Restatement (Second) of Contracts § 202(1) (1981)) ("Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight."). As the Supreme Court has noted, if the goodwill accounting forbearance had not been available, a thrift taking over an ailing thrift (or here, a new institution being created to take over two ailing thrifts) would have been insolvent from its creation. *Winstar III*, 518 U.S. at 862.

In the instant case, Plaintiffs requested several forbearances from the Government, including goodwill amortization. This forbearance was memorialized in the Forbearance Letter, which is evidence that the Government accepted Plaintiffs' offer. Thus, the Court finds that both parties had

---

[3] *See, e.g.*, Deposition of Douglas Crocker taken July 22, 1999 at 77-78, Deposition of Robert Bobb taken July 19, 1999 at 180-86.

the requisite mutual, voluntary intent to form a contract.

### 2. The Consideration

The *Winstar* cases recognized the savings conferred to the Government, by not having to take over the ailing thrift, constituted consideration to support a contract. *See Winstar II*, 64 F.3d at 1542 ("Glendale consummated its merger with Broward on this understanding and in doing so saved the government hundreds of millions of dollars."). Here, Republic saved the Government the task of taking over Citizens and Fireside, both of which were either insolvent or facing insolvency. Therefore, the Court concludes that the contract between the FHLBB and Republic was supported by ample consideration.

### 3. Actual Authority to Bind the United States

The Government concedes that the FHLBB and FSLIC had the authority to enter into a contract with Republic, but argues that the FHLBB had no authority to enter into contracts guaranteeing holding companies against the risk of loss. Defendant asserts that since the Federal Circuit and the Supreme Court has not addressed the issue of whether the Government had authority to enter into contracts with holding companies, this Court should find that such authority did not exist.

It is well settled that the FHLBB and FSLIC have the authority to enter into the types of contracts at issue in *Winstar* cases. *Cal. Fed.*, 245 F.3d at 1347 ("We have already answered the question of whether the FHLBB and the FSLIC have the authority to enter into contracts like these in the affirmative."); *Winstar II*, 64 F.3d at 1548 ("[T]he Bank Board and the FSLIC, as the principle regulators of the thrift industry, were fully empowered to enter into the contracts at issue here."). Thus, the distinction that Defendant makes between Republic and its holding company is irrelevant. The Court finds that the Defendant had the authority to enter into a contract with Plaintiffs.

The Court, therefore, finds a valid contract existed and that Defendant breached that contract. The Court hereby **GRANTS** Plaintiffs' Motion for Summary Judgment as to liability. Now the Court will turn its attention to the issue of damages.

## VI.  Damages

Plaintiffs seek restitution damages for 1) the $17 million initial capital contribution by Plaintiffs into Republic and 2) the $926,000 profit the Government received by selling Republic. In the alternative, Plaintiffs seek restitution damages for the "benefit of time" conferred on the Government, in the amount of $24,626,000 as well as the "earnings benefit" on that sum. Further, Plaintiffs seek reliance damages for the cost of receivership in the amount of $647,463.

**A. Restitution Damages**

The Federal Circuit has held that restitution is available to a private party as a remedy to a contract breach by the Government in *Winstar*-related cases. *See Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1372 (2001). The goal of restitution is "to restore the non-breaching party to the position he would have been in had there never been a contract to breach." *Glendale Fed. Bank v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001). There are two alternative measures of a party's restitution interest. The first measure is "the value of the benefits received by the defendant due to the plaintiff's performance." *Landmark*, 256 F.3d at 1372. The second measure is the cost of performance standard, "which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract." *Id.*

**1. Republic's Initial Capital Contribution**

Plaintiffs assert that they are entitled to recover the $17 million contributed based on the cost of performance measure of restitution. It has been held in *Winstar*-related cases that a plaintiff's contribution under the Assistance Agreement may be a proper restitution remedy. *See Landmark*, 256 F.3d at 1382; *see also Hansen Bancorp, Inc. v. United States*, 53 Fed. Cl. 92, 104 (2002). In *Landmark*, the Assistance Agreement required Landmark to make an initial contribution of "not less than $20,000,000." 256 F.3d at 1370. Plaintiffs in that case contributed real estate and cash valued at $21.5 million, and the Federal Circuit upheld this court's decision to grant the full $21.5 million in restitution damages, rather than the $20 million minimum amount required by the Assistance Agreement.

The Assistance Agreement and related documents set forth the mutual capital contribution obligations for the parties. *See* Assistance Agreement §§ 3(a)(2) & 12; *see also* FHLBB Resolution No. 85-773. Plaintiffs contributed a total of $17 million to Republic, consisting of a $5 million equity interest in BCD and a $12 million earnings preference on the future earnings of BCD. Defendant argues that Plaintiffs are not entitled to recover this sum because they suffered no actual net loss from the performance of the contract. D. Resp. at 22. The Government offers evidence that BCD later filed for bankruptcy to support its argument. In addition, Defendant urges the Court not to award the $17 million because it was not cash.

The Court sees no reason to recognize the distinction that Defendant emphasizes. Courts have allowed recovery of the initial capital contribution based on an Assistance Agreement, as noted above. The Assistance Agreement and related documents in this case outlined the Plaintiffs' contribution requirements, and the equity interest and future earnings preference were sufficient to satisfy the terms of the contract. For the purposes of restitution, a plaintiff's performance must be measured as of the time of the contract. While the Government argues that the capital contribution later became worthless, it is the value at the time of contract performance that is relevant. *See Arizona v. United States*, 575 F.2d 855, 865 (Cl. Ct. 1978) ("Restitutionary recovery is limited to the reasonable value of the injured party's performance, measured as of the time it was rendered."); *see also* Restatement (Second) of Contracts § 371 (1981)**.** Therefore, Plaintiffs are entitled to recover the $17 million, which reflects the value of their initial capital contribution at the time of

the contract.

### 2. Offset of Government's Cash Contribution

An award of restitution should be offset by the benefits that the breaching party has conferred upon the non-breaching party. *See* Restatement (Second) of Contracts § 384 (1981). The benefits at issue must be received directly from the breaching party. *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1315 (Fed. Cir. 2004). In *Hansen*, the recovery in restitution of a $1 million initial capital contribution under an Assistance Agreement was not offset by a $1.2 million dividend, as the dividend came from the thrift and not from the Government. In this case, however, the Assistance Agreement required the Government to contribute $3 million in cash to Republic. This cash infusion was a direct benefit to Plaintiffs, and so the $17 million recovery in restitution must be offset by the Government's direct $3 million contribution.

### 3. The Government's $926,000 profit

Another aim of restitution is to prevent the unjust enrichment of the breaching party. *LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1376 (Fed. Cir. 2003). Any benefit that the breaching party has enjoyed from the contract must be returned to the non-breaching party. *Glendale*, 239 F.3d at 1380; *see* Restatement (Second) of Contracts § 344 (1981) (defining a party's restitution interest as the "interest in having restored to him any benefit that he has conferred on the other party").

Here, the Government seized Republic and then sold it again as a whole-bank, no cost transaction for a $926,000 profit. For seven years Plaintiffs had marshaled Republic out of insolvency and had turned it into a valuable asset. It would be unjust enrichment for the Government to retain the profit from the sale of Republic, and so it must be returned to Plaintiffs.[4] The Government does not dispute that Republic sold for this price, but rather attempts to prove that the FDIC, as receiver, benefitted from this sum but that the Defendant did not. The FDIC is a federal agency, and Federal Circuit case law states that a line cannot be drawn between the FDIC and the United States. *See H.C. Bailey v. United States*, 341 F.3d 1342, 1346 (Fed. Cir. 2003). The Government's breach led to the seizure of Republic and eventually to the sale of that company to a third party for $926,000. As this sum represents a profit resulting from the breach, it must be returned to the Plaintiffs.

---

[4] When determining damages, the Court must not bestow upon the non-breaching party a windfall by compensating Plaintiffs above and beyond the loss suffered under the breached contract. *See LaSalle Talman Bank*, 317 F.3d at 1371. As the Court is awarding Plaintiffs the full $926,000 profit, the Court, therefore, does not award Plaintiffs the $647,463 requested in reliance damages for the costs of receivership. The amount of $926,000 reflects the value of Republic at the time it was sold by the Government. The $647,463 reflects the costs of receivership incurred after the sale took place, or the difference between $926,000 and the $247,537 value of the receivership at the time of briefing. Awarding the $647,463 would count that amount twice as the profit from the sale and again as a cost taken out of the receivership, but not the profit awarded to Plaintiffs.

**4. Plaintiffs are Not Entitled to Restitution for the Benefit of "Time" Conferred**

In the alternative, Plaintiffs seek a restitution award for the benefit of time conferred on the Government. The Federal Circuit has recognized that the Government received the benefit of "time to see what the market would do before having to commit substantial resources to the problem" in exchange for its promises regarding regulatory forbearance. *Glendale*, 239 F.3d at 1382. While it has been well-established that "the value of time was more than zero" in these cases, courts have not granted recovery for the value of time because there was no proof of its worth. *Id.* As this Court has indicated in the past, while the precedent in this area is still evolving, it would be unsupported by case law to award restitution for the benefit of time conferred because the Federal Circuit has only affirmed restitution damages that reflect direct contribution by plaintiffs as part of contractual performance. *See Slattery v. United States*, 69 Fed. Cl. 573, 586 (2002).

In *Glendale*, the plaintiffs argued that the value of time equaled the amount of the acquired thrift's net liabilities, on the theory that otherwise, the Government would have had to spend that money to liquidate the thrifts. 239 F.3d at 1382. The Federal Circuit rejected this argument, stating that there were several other potential acquirers available to take over the banks. *Id.* In addition, the relevant time period was not clear. Plaintiffs distinguish the facts of this case by arguing that the time period is definite (Plaintiffs took over Republic on August 30, 1985 and the Government seized Republic on June 5, 1992), and that unlike *Glendale*, the value is not speculative. Plaintiffs point to internal government memoranda to show that the government catalogued "each and every alternative that the Government considered, along with the exact cost for implementing those different alternatives." P. Mot. S.J. at 24.

Plaintiffs argue that there were only four options available to the Government regarding how to handle the Citizens and Fireside problems: 1) accept Plaintiffs' bid; 2) accept a bid from a competing investment group; 3) liquidate; or 4) accept the Land of Lincoln bid. Plaintiffs assert that the second option was "quickly ruled out as overly costly," the third option would have cost the Government between $23 million and $29.7 million, and the fourth option would have cost the Government $26.7 million. The Government, however, states that the existence of a liquidation estimate does not speak to the likelihood of liquidation, as the estimate was required by statute. D. Opp'n at 33. Further, the Government offers evidence that there were not only four options available at the time Plaintiffs acquired Fireside and Citizens, but that a range of alternatives existed, such as providing assistance directly to a thrift without an acquisition, placing a thrift in a holding ("wait and see") pattern, or adjusting the marketing strategy and beginning a new bidding process.

While it is clear to the Court that the Government did receive a large and valuable time benefit from performance of the contract, the alternative, more definite measure of restitution damages discussed above is more appropriate. Plaintiffs are not entitled to recover restitution damages for the benefit of time conferred on the Government. Therefore, the Court necessarily must also deny Plaintiffs' claim for damages for the earnings benefit on the Government's time benefit.

Of course, this opinion does not do full justice to the Plaintiffs' cause. The value of the

money recovered is far lower than the money spent because of the time value of money they have lost. If this were a CDA contract or a tax refund claim, Plaintiffs would be entitled to pre-judgment interest to compensate them for the time value lost. However, Congress has not waived sovereign immunity which would allow a court to assess interest in this class of non-CDA contracts. Thus, complete justice cannot be done. As the Court stated in *Suess v. United States*, 52 Fed. Cl. 221 (2002):

> The court understands, of course, that the award of approximately $35 million for the value of a franchise seized 12 years ago provides Franklin with far less in economic terms than it is owed. While the court is limited by the prohibition on pre-judgment interest in this case, the court believes that the award is grossly inadequate in view of the damages actually suffered by Franklin. This, of course, is a recurring problem in the *Winstar*-related cases, because parties who are harmed, even when able to prove damages in these difficult and novel cases, will not be made fully whole. Indeed, it is ironic that Franklin is prevented under the law from being made whole because it cannot obtain interest on its damages caused by the government's breach, but the government itself claims massive interest assessments against Franklin on the tax it contends the Franklin receivership owes.
>
> Unfortunately, the courts, at least at this juncture, are not the fora that can make the damaged parties whole. This represents one of those gaps in our Nation's system of the rule of law. Our great Constitution's Framers were men of extraordinary vision. They understood that while a framework for the protection of rights under law had been established in 1789, its complete fulfillment was an ongoing project for the ages. Through statute and executive action our Nation has moved toward that goal. This is a case where the movement should continue through the legislative process.

*Id.* at 232

## VII. Conclusion

For the reasons set forth above, the Court finds that a contract existed between Republic and the FHLBB. The Court further finds that the FHLBB breached that contract. Therefore, the Court hereby **GRANTS** Plaintiffs' Motion for Summary Judgment as to Liability and Damages and **DENIES** Defendant's Cross-Motion for Summary Judgment. The Court further **GRANTS** Defendant's Motion to Dismiss Plaintiff Meadows for lack of standing. The Clerk is directed to dismiss Meadows from the litigation. Plaintiffs are **AWARDED** $17 million for the value of their initial capital contribution minus the $3 million cash contribution by the Government plus $926,000 in restitution for a total damages award of $14,926,000.

The Court will schedule a status conference to discuss any remaining issues with counsel.

**It is so ORDERED**.

                                              s/Loren A. Smith
                                              LOREN A. SMITH
                                              Senior Judge